**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM S. MCDOWELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 1:12-cv-03519** |
| | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant,** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff, William McDowell, seeks judicial review of a final decision of the Commissioner

of the Social Security Administration ("SSA") denying his application for a period of disability,

disability insurance benefits, and supplemental security income benefits ("disability benefits") under

Title II and Title XVI of the Social Security Act ("the Act"). Mr. McDowell has filed a motion for

summary judgment, seeking to reverse the Commissioner's final decision or remand the case for

consideration of the issues raised herein. For the reasons set forth below, Mr. McDowell's motion

to remand is granted [dkt. 15] and the Commissioner's motion to affirm is denied [dkt. 24].

**I.    Procedural History**

Mr. McDowell applied for disability benefits on March 18, 2009, alleging that he became

disabled on September 1, 2008.[1] His claims were denied initially on July 15, 2009, and again upon

reconsideration on December 2, 2009.[2] On December 15, 2009, Mr. McDowell requested a hearing

before an Administrative Law Judge ("ALJ").[3] A hearing presided over by ALJ Robert Senander

---

[1] R. at 16.
[2] *Id.*
[3] *Id.*

was held on August 23, 2010 in Chicago, Illinois.[4] Following the hearing, the ALJ issued an

unfavorable decision on November 23, 2010, concluding that Mr. McDowell was not disabled under

sections 216(i), 223(d) and 1614(a)(3)(A) of the Act.[5] The Appeals Council denied Mr. McDowell's

request to review the ALJ's decision, so the ALJ's decision is the final decision of the

Commissioner.[6]

## II.       Factual Background

The facts set forth in this section are derived from the administrative record. We begin with

an overview of Mr. McDowell's background and relevant medical history. We then summarize the

ALJ hearing testimony and the ALJ's decision.

### A.       Mr. McDowell's Background and Relevant Medical History

Mr. McDowell was born on July 18, 1945, and at the time of the ALJ's decision he was

sixty-five years old.[7] He completed the ninth grade and has training as a certified nursing assistant

("CNA").[8] Mr. McDowell's past relevant work includes work as a home health care worker.[9] This

is the only past relevant work that the ALJ examined in his decision. Though it is discussed in the

hearing that Mr. McDowell once worked as a CNA, it appears that the ALJ did not consider that

employment because the CNA job requirements are much too challenging for Mr. McDowell to

complete now.[10] Mr. McDowell alleged that he became unable to continue his work in home health

care on September 1, 2008 because of abnormally high blood  pressure or "hypertension,"[11] an

---

[4] *Id.*
[5] R. at 13-22.
[6] *Id.*
[7] R. at 13, 32.
[8] R. at 33.
[9] R. at 21.
[10] R. at 36.
[11] The Merck Manual for Healthcare Professionals,
http://www.merckmanuals.com/professional/cardiovascular_disorders/hypertension/overview_of_hypertension.html
?qt=hypertension&alt=sh (2013).

airflow limitation caused by an inflammatory response to inhaled toxins such as cigarette smoke, also known as Chronic Obstructive Pulmonary Disease or "COPD,"[12] lung disease, arthritis, and mental illness.[13]

It is of note that the ALJ had very limited information and medical records to review on Mr. McDowell. What we do know is that Mr. McDowell was first diagnosed with hypertension in approximately 1989 and COPD in approximately 1994.[14] Mr. McDowell also has a fifty-year history of tobacco use and smoked up to two packs of cigarettes a day during that time period.[15] This information comes from a June 2009 consultative examination performed by the Disability Determination Services ("DDS"), discussed below.[16] There are no available medical records from the time prior to filing. Additionally, we know that Mr. McDowell quit smoking in January 2010.[17]

The medical records available for Mr. McDowell are primarily comprised of doctors' notes from several visits to the emergency room over the course of about a year from March 2009 through April 2010. In addition to that, all we have is the consultative examinations of two doctors who examined Mr. McDowell for the purpose of determining disability, and the opinion evidence of two doctors who reviewed Mr. McDowell's medical records for the DDS.

On March 4, 2009, Mr. McDowell went to the emergency room at Provident Hospital of Cook County with a cough that was producing yellow-green fluid and pain in the lower region of the rib cage.[18] He was diagnosed with acute or chronic bronchitis, and COPD with emphysema.[19]

---

[12] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/pulmonary_disorders/chronic_obstructive_pulmonary_disease_and_related_disorders/chronic_obstructive_pulmonary_disease.html?qt=COPD&alt=sh (2012).
[13] R. at 115.
[14] R. at 208-09.
[15] *Id.*
[16] *Id.*
[17] R. at 318.
[18] R. at 196.
[19] R. at 197.

On June 24, 2009, Mr. McDowell had a consultative examination with Liana Palacci, D.O., at the request of the SSA for the purpose of determining disability.[20] Dr. Palacci reviewed the medical records from Provident Hospital of Cook County and indicated that an x-ray showed marked emphysema.[21] She also noted that Mr. McDowell had refused an INH treatment.[22] She indicated that Mr. McDowell used an inhaler twice a day, particularly with exertion and changes in the weather.[23] Dr. Palacci's clinical impressions were that Mr. McDowell had well controlled COPD, poorly controlled hypertension, and a history of psychiatric disease.[24]

On July 14, 2009, Ernst Bone, M.D., a non-examining State agency doctor, reviewed Mr. McDowell's file for the purpose of determining disability.[25] Dr. Bone concluded that Mr. McDowell was capable of lifting twenty pounds occasionally and ten pounds frequently, standing/walking for approximately six hours in an eight hour day, and sitting for approximately six hours in an eight hour day.[26] Dr. Bone also stated that Mr. McDowell should avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases and poor ventilation.[27]

On July 22, 2009, Mr. McDowell went to the emergency room at the University of Chicago Medical Center because he was feeling dizzy and weak, and was experiencing chest pain and lightheadness (also known as near syncope).[28] According to the hospital records, he had been at his

---

[20] R. at 208-11.
[21] R. at 208.
[22] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/infectious_diseases/mycobacteria/tuberculosis_tb.html?qt=INH%20trea tment&alt=sh (2012) (INH or isoniazid is a drug used to treat tuberculosis).
[23] R. at 208.
[24] R. at 209, 211 (Mr. McDowell has a history of schizophrenia that was diagnosed in the 1960s, but he had not had a psychiatric hospitalization in ten years and denied any auditory hallucinations).
[25] R. at 227-34.
[26] R. at 228.
[27] R. at 231.
[28] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/cardiovascular_disorders/symptoms_of_cardiovascular_disorders/synco pe.html?qt=syncope&alt=sh (2012); R. at 238.

primary doctor's office prior to going to the emergency room when he began to feel "woozy."[29] This is the only mention of Mr. McDowell's primary doctor in the record and we have no other information about this primary doctor or his treatment of Mr. McDowell. At the hospital, Mr. McDowell stated that he was experiencing shortness of breath and weakness while walking two blocks to the store.[30] He further explained that he used to be able to walk four blocks before becoming short of breath, but could now only walk two.[31] The doctor noted that Mr. McDowell was still smoking.[32]

During his stay at the emergency room, Mr. McDowell was unable to perform an exercise stress test due to an inability to walk on the treadmill.[33] A myocardial perfusion scan[34] showed mild abnormalities with evidence of reversible myocardial ischemia.[35] Mr. McDowell refused to go ahead with a scheduled cardiac catheterization, despite explanations from doctors regarding the risks and benefits of the procedure.[36]

On August 19, 2009, Mr. McDowell had a follow-up visit at the University of Chicago Medical Center where he was found to have the same symptoms as the previous visit.[37] The doctor noted that while Mr. McDowell did continue to smoke, he was cutting back.[38] The doctor's

---

[29] R. at 239.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] R. at 244.
[34] R. at 253; The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/cardiovascular_disorders/cardiovascular_tests_and_procedures/radionuclide_imaging.html?qt=myocardial%20perfusion%20scan&alt=sh (2013) (a myocardial perfusion scan is used with stress testing to evaluate patients with chest pain of an unknown origin).
[35] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/cardiovascular_disorders/coronary_artery_disease/acute_coronary_syndromes_acs.html?qt=reversible%20myochardial%20ischemia&alt=sh (2013) (reversible myochardial ischemia is a reversible condition where the muscles of the heart become stressed with exercise).
[36] R. at 250.
[37] R. at 258.
[38] R. at 259.

impression was shortness of breath with no clear etiology, possible chronic lung disease and/or interstitial lung disease with possible coronary involvement.[39] An angiogram[40] was recommended, but Mr. McDowell was not sure he wanted to have one because he had no insurance.[41]

On November 6, 2009, Rochelle Hawkins, M.D., performed a consultative examination on Mr. McDowell for the purpose of determining disability.[42] Dr. Hawkins noted that his COPD appeared to be worsening and that he complained of becoming fatigued easily.[43] Dr. Hawkins indicated that Mr. McDowell was smoking approximately ten cigarettes a day, down from two packs a day.[44] Dr. Hawkins performed a lung function test[45] on Mr. McDowell which showed that he has moderate airway obstruction in addition to moderate small airway damage.[46] Dr Hawkins noted in her report that they had to stop the testing because Mr. McDowell was feeling dizzy. Dr. Hawkins also reported five out of five bilateral grip strength and normal muscle strength, stating that Mr. McDowell had no anatomic abnormality of either upper extremity and no limitation of motion in the shoulder, elbow or wrist joints.[47] Dr. Hawkins concluded that Mr. McDowell was able

---

[39] R. at 259; The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/pulmonary_disorders/interstitial_lung_diseases/overview_of_interstitial _lung_disease.html?qt=interstitial%20lung%20disease&alt=sh (2013) (chronic or interstitial lung disease can refer to asthma or COPD which includes emphysema and/or chronic bronchitis).

[40] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/special_subjects/principles_of_radiologic_imaging/angiography.html?q t=angiography&alt=sh (2012) (an angiogram is an x-ray treatment to view the heart).

[41] R. at 258.

[42] R. at 280-88.

[43] R. at 280.

[44] Id.

[45] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/pulmonary_disorders/asthma_and_related_disorders/asthma.html?qt=F EV1&alt=sh (2013) (FEV1/FVC/FEF testing is used to indicate how severe a patient's airway obstruction is).

[46] R. at 289 (Mr. McDowell had a best pre-med FEV1 of 2.49 and a best post-med FEV1 of 2.40. His pre-med FEV1 shows that before the use of an inhaler he was at 96% of predicted value for similar patients, and his post-med FEV1 shows that he was at 92% of what is predicted for similar patients. The FEV1/FVC shows that Mr. McDowell can only blow out 67% of his lung capacity before medication and 69% after medication, compared to a predicted value of 80%. Mr. McDowell's FEF 25-75, which gives a measure of small airway damage, is 48% of the predicted value).

[47] R. at 282, 287.

to sit, speak and hear without limitations, but had some difficulty with prolonged standing, walking, lifting and carrying due to COPD.[48]

Between November 24, 2009 and December 1, 2009, Barry Free, M.D., and Thomas Low, PhD, reviewed Mr. McDowell's medical records on behalf of the DDS for the purpose of determining disability.[49] Dr. Free and Dr. Low did not examine Mr. McDowell in person.[50] Their assessment expressed that based on the medical records, Mr. McDowell was capable of light work activity with environmental limitations.[51] They found that while Mr. McDowell's impairment could be expected to "produce some limitations in function . . . the extent of the limitations described by the claimant in terms of having problems walking and using his hands, exceeds that supported by the objective medical findings cited."[52]

An outpatient hospital treatment note from January 29, 2010 states that Mr. McDowell had stopped smoking for three weeks, his shortness of breath was better, and he could walk two blocks before having to stop.[53] An outpatient hospital treatment note from March 31, 2010 states that Mr. McDowell's shortness of breath was better since using an inhaler and his chest pain was improving as he was now able to walk two and a half blocks, but still had some chest pressure, pain and shortness of breath.[54]

On April 15, 2010, Mr. McDowell went to the emergency room at St. Bernard Hospital after having a fainting episode known as syncope.[55] The treating doctor noted Mr. McDowell's history of COPD and hypertension, and stated that he had bradycardia, otherwise known as a slow

---

[48] R. at 283.
[49] R. at 296-98.
[50] *Id.*
[51] R. at 298.
[52] *Id.*
[53] R. at 429.
[54] R. at 421.
[55] R. at 318, 412.

heartbeat lower than sixty beats per minute.[56] A chest examination showed hyperinflation consistent with obstructive lung disease.[57] The doctor noted that Mr. McDowell had quit smoking three months prior.[58] Mr. McDowell was discharged on April 17 and did not require any surgeries or emergency services.[59]

### B.     The Hearing Before The ALJ

Mr. McDowell's hearing before the ALJ occurred on August 23, 2010 in Chicago, Illinois.[60] He testified that he was sixty-five years old, 5'6" tall, and had a weight of 104 pounds.[61] He also testified that he lived alone in senior citizen housing, his last completed educational level was ninth grade, and he had training as a CNA.[62] Mr. McDowell explained that he does his own cooking, cleaning, grocery shopping and laundry.[63]

The ALJ asked Mr. McDowell when he last worked and it was determined that it was sometime between June and September of 2008.[64] The ALJ prompted Mr. McDowell to discuss his recent employment history.[65] Mr. McDowell discussed the home health care position he held in 2007 where he worked with a mentally disabled teenager named Charles.[66] He testified that he took care of Charles by fixing his food, helping him shower, and combing his hair.[67] The ALJ asked Mr. McDowell about the lifting requirements of that job, and Mr. McDowell testified that he only had

---

[56] R. at 318-19, 414.
[57] R. at 379; The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/pulmonary_disorders/chronic_obstructive_pulmonary_disease_and_rela ted_disorders/chronic_obstructive_pulmonary_disease.html?qt=hyperinflation&alt=sh (2012) (overinflation of the lung is a common symptom of COPD).
[58] R. at 318.
[59] R at 416.
[60] R. at 29.
[61] R. at 32.
[62] R. at 33, 39.
[63] R. at 39-40.
[64] R. at 33-34.
[65] R. at 33-38.
[66] R. at 34-35, 41-42.
[67] R. at 35.

to lift dishes, plates, and small bags of garbage.[68]

Mr. McDowell and the ALJ also discussed a second job in home health care that he had from approximately 2002-2004.[69] Mr. McDowell testified that he worked with an individual in a wheelchair named Dr. Smith and that this position was similar to his work with Charles.[70] He said he cooked for Dr. Smith as well as pushed him in his wheelchair.[71]

Mr. McDowell's attorney asked him some questions to clarify his work with Charles and Dr. Smith.[72] Mr. McDowell testified that he did not have to lift Charles when helping him shower, but steadied him when he was getting in and out.[73] He also testified that neither Charles nor Dr. Smith ever fell when he was on the job, but if they had he would have tried his best to help them up.[74] Mr. McDowell stated that during the course of his work with Charles and Dr. Smith he never had to lift more than ten pounds.[75] He also testified he helped both Charles and Dr. Smith with grocery shopping and laundry.[76]

Mr. McDowell's attorney noted that Mr. McDowell weighed 130 pounds when he worked with Charles and Dr. Smith and asked Mr. McDowell if he thought he could do the lifting required for those jobs at his current weight of 104 pounds.[77] He responded that he knew he could not because of his difficulty breathing from COPD and the limitation in his left arm.[78] He testified that the limitation in his arm had gotten worse since he used to work.[79]

---

[68] *Id.*
[69] *Id.*
[70] R. at 36-37.
[71] R. at 39.
[72] R. at 37.
[73] *Id.*
[74] R. at 37-38.
[75] R. at 38.
[76] *Id.*
[77] R. at 40.
[78] *Id.*
[79] *Id.*

Mr. McDowell explained that the reason he quit his job working for Charles was because he could no longer do the work, which involved walking up and down steps constantly and running after Charles.[80] Mr. McDowell's attorney asked him if he thought there were any tasks from his job with Dr. Smith that he would no longer be able to do.[81] Mr. McDowell said he would not be able to do any lifting, and that he would not be able to push Dr. Smith's wheelchair to the extent that he used to, about six blocks a day, because he became too tired and out of breath.[82] He testified that he did not think he could do a home health care job today, even if he did not have to lift more than ten pounds, because of his fatigue and the requirement of constant movement.[83]

Mr. McDowell and his attorney discussed Mr. McDowell's thirty-pound weight loss. Mr. McDowell testified that he had lost his appetite and doctors did not know why and had given no medical explanation for his weight loss.[84] He mentioned that his doctors had him taking Ensure, a kind of protein shake, to help him gain weight and that he was up seven pounds from before when he weighed ninety-six pounds.[85] Mr. McDowell also attributed this increase in weight to taking vitamins and quitting smoking, which helped his appetite.[86]

The ALJ probed the attorney and Mr. McDowell further on the condition of Mr. McDowell's arm.[87] Mr. McDowell testified that he had a skin graft due to third degree burns from the explosion of a lighter in 1997.[88] His attorney noted that he had a range of motion issue and it was difficult for him to lift his left arm because reaching tore the skin.[89]

---

[80] R. at 41-42.
[81] R. at 41.
[82] R. at 42-43, 45.
[83] *Id.*
[84] R. at 43.
[85] R. at 44.
[86] *Id.*
[87] R. at 47.
[88] *Id.*
[89] *Id.*

The attorney questioned Mr. McDowell about the nitroglycerin[90] he was taking.[91] Mr. McDowell testified that he takes nitroglycerin for chest pains at least three times a week.[92] He testified that when he gets the chest pains, which often occur in response to exertion, he takes nitroglycerin and then sits and rests for five minutes.[93] Mr. McDowell affirmed that his chest pains would probably not stop him from doing a job.[94]

Finally, Mr. McDowell testified that on some days he could not leave his home because it was too hot or too cold which was bad for his breathing.[95] He explained that there were about seven days in the past summer where he could not leave his home because it was too hot.[96]

## C.      The ALJ's Decision

In an opinion issued on November 23, 2010, the ALJ concluded that Mr. McDowell was not disabled within the meaning of the Act at any time after his alleged onset date of September 1, 2008.[97] Although the ALJ decided that Mr. McDowell met the insured status requirements of the Act, he found that Mr. McDowell did not establish that he was unable to perform his past relevant work in home health care.[98]

SSA regulations prescribe a sequential five-part test for ALJs to use in determining whether a claimant is disabled.[99] The ALJ's first step is to consider whether the claimant is presently

---

[90] The Merck Manual for Healthcare Professionals, http://www.merckmanuals.com/professional/cardiovascular_disorders/coronary_artery_disease/angina_pectoris.html ?qt=nitroglycerin&alt=sh (2013) (nitroglycerin is a drug used for immediate relief of chest pain).
[91] *Id.*
[92] R. at 48.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] R. at 49.
[97] R. at 16.
[98] R. at 18, 21.
[99] R. at 17; C.F.R. § 404.1520(a)(1).

engaged in any substantial gainful activity which would preclude a disability finding.[100] In the present case, the ALJ determined that Mr. McDowell had not engaged in any substantial gainful activity since the alleged onset date of September 1, 2008.[101]

The second step is for the ALJ to consider whether the claimant has a severe impairment or combination of impairments.[102] In the present case, the ALJ concluded that Mr. McDowell had the medically determinable severe impairments of COPD and hypertension.[103]

The ALJ's third step is to consider whether the claimant's impairments meet or equal any impairment listed in the regulations as being so severe as to preclude gainful activity.[104] In the present case, the ALJ determined that Mr. McDowell's impairments did not meet or medically equal an impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.[105] The ALJ considered section 4.00 of the listings and found that Mr. McDowell did not meet or equal the requirements for chronic heart failure, ischemic heart disease, recurrent arrhythmias, peripheral arterial disease, or symptomatic congenital heart disease.[106] Because there is no specific listing for hypertension, the ALJ factored in the effects of hypertension on other body systems, but found that Mr. McDowell's hypertension did not warrant a determination of "meets or equals" of any listing.[107] The ALJ also considered 3.02 of the listings and concluded that there was no evidence to suggest the listing for chronic obstructive pulmonary insufficiency had been met or equaled.[108] Finally, the ALJ noted that the record makes some reference to depression, but that because the record does not

---

[100] *Id.*; C.F.R. § 404.1520(a)(4)(i).
[101] R. at 18.
[102] R. at 17; C.F.R. § 404.1520(a)(4)(ii).
[103] R. at 18.
[104] R. at 17; C.F.R. § 404.1520(a)(4)(iii).
[105] R. at 18-19.
[106] R. at 18.
[107] R. at 18-19.
[108] R. at 19.

show an actual assessment, any ongoing related treatment, or any medication for depression, it was not a medically determinable impairment in Mr. McDowell's case.[109]

In the event that none of the claimant's impairments meet the listing requirements, the ALJ proceeds to the fourth step of the test—whether the claimant has the residual functional capacity ("RFC") to perform the requirements of his past relevant work.[110] The ALJ must evaluate the claimant's RFC based on the record, the claimant's testimony, and a comparison of the requirements of his past work.[111] The RFC is an assessment of the maximum work-related activities a claimant can perform despite his impairments.[112]

If determining the claimant's RFC requires the ALJ to assess subjective complaints, then the ALJ follows a two-step process.[113] First, the ALJ decides whether there is an underlying medically determinable impairment—an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's symptoms.[114] If such an impairment exists, the ALJ then evaluates the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's functioning.[115] The ALJ must consider the entire record when making decisions about the credibility of the claimant's subjective complaints.[116] If, after this process, the ALJ determines that the claimant's RFC makes him able to perform his past work, he is not found to be disabled.[117]

---

[109] *Id.*
[110] R. at 17; C.F.R. § 404.1520(a)(4)(iv).
[111] R. at 19; C.F.R. § 404.1520(e).
[112] R at 17; C.F.R. § 404.1545
[113] R. at 19; S.S.R. 96-7p.
[114] *Id.*
[115] *Id.*
[116] *Id.*
[117] R. at 18; S.S.R. 96-8p.

In the present case, the ALJ found that Mr. McDowell had the RFC "to perform light work as defined in 20 C.F.R 404.1567(b) and 416.967(b)" except that Mr. McDowell should "avoid concentrated exposures to extreme heat, cold, humidity, fumes and dust."[118] In terms of Mr. McDowell's subjective complaints, although the ALJ found that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he also found that Mr. McDowell's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with his RFC assessment.[119]

In determining McDowell's credibility, the ALJ looked at his ability to engage in daily activities.[120] The ALJ specifically noted that Mr. McDowell "stated that he was able to attend to his personal needs, prepare simple meals, watch television, clean laundry, . . . grocery shop, attend church services and follow written instructions."[121] The ALJ also pointed to Mr. McDowell's infrequent work history which did "not suggest a solid motivation or desire to work."[122]

The ALJ further concluded that Mr. McDowell's subjective statements were not credible because they were inconsistent with objective medical signs and the findings of the record as a whole.[123] The ALJ pointed to the fact that Mr. McDowell worked for many years after his hypertension and COPD were diagnosed, and stated there was no sudden deterioration of his condition.[124] The ALJ relied on the consultative examinations of Dr. Palacci and Dr. Hawkins.[125] He noted Dr. Palacci's conclusion that Mr. McDowell's COPD was well controlled with an inhaler,

---

[118] R. at 19.
[119] R. at 20.
[120] R. at 19.
[121] Id.
[122] R. at 20; see R. at 107-11.
[123] R. at 21.
[124] R. at 20.
[125] Id.

and found that Dr. Hawkins' conclusions about Mr. McDowell's ability to stand, walk, lift and carry were consistent with a finding that Mr. McDowell's COPD was "not so severe that [he] is unable to engage in light work activity."[126]

The ALJ further explained that Mr. McDowell had "continually disregarded his treating physicians' instructions to stop smoking cigarettes" even though doctors had told him his condition would improve if he stopped.[127] The ALJ also suggested that because Mr. McDowell had in the past refused an INH treatment and a catheterization, his "conservative care for his physical problems strongly suggested that his symptoms remained well controlled."[128]

Finally, the ALJ gave great weight to the opinion evidence from the DDS.[129] The DDS evaluated the medical record and indicated that Mr. McDowell was capable of performing the exertional demands of light work despite his COPD and hypertension.[130] The ALJ also assessed the testimonials from Mr. McDowell's daughter, but those were given less weight because of their high degree of subjectivity.[131]

The ALJ additionally determined that Mr. McDowell was "capable of performing his past relevant work as a home health care worker," and that this work did "not require the performance of work-related activities precluded by" Mr. McDowell's RFC.[132] In comparing Mr. McDowell's RFC "with the physical and mental demands of this work," the ALJ found that Mr. McDowell was "able to perform it as actually and generally performed."[133] In determining this, the ALJ explained

---

[126] *Id.*
[127] R. at 21.
[128] *Id.*
[129] *Id.*
[130] R. at 21; *see* R. at 296-98.
[131] R. at 21; *see* R. at 139-40.
[132] *Id.*
[133] *Id.*

that Mr. McDowell's testimony was very vague concerning any specific limitations that his COPD and hypertension would cause him while working in home health care.[134] The ALJ expressed that Mr. McDowell's lengthy description of his past work experience did not suggest "that the work would push [him] past safe levels of physical activity."[135] Because the ALJ found that Mr. McDowell could perform his past relevant work and was thus not disabled within the meaning of the Act, he did not proceed to the fifth step of the analysis.[136]

### III.    Standard of Review

The Court must sustain the Commissioner's findings of fact if they are supported by substantial evidence and are free of legal error.[137] Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[138] The standard of review is deferential, but the reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision.[139] Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a plaintiff is disabled falls upon the Commissioner and not the Court.[140] Although the ALJ need not address every piece of evidence or testimony presented, he must adequately discuss the issues and build a logical bridge from the evidence to his conclusions.[141] The Court will conduct a critical review of the evidence and will not uphold the ALJ's decision if it lacks evidentiary support or if the Commissioner applied an erroneous legal

---

[134] *Id.*
[135] R. at 21-22.
[136] R. at 22.
[137] 42. U.S.C. § 405(g).
[138] *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citing *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009)).
[139] *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).
[140] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).
[141] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).

standard.[142]

## IV.    Analysis

Mr. McDowell argues that the Court should reverse and remand the decision of the ALJ because the ALJ failed to: (1) properly evaluate the credibility of Mr. McDowell's allegations; (2) include all of Mr. McDowell's limitations in the RFC assessment; and (3) follow the requirements of SSR 82-62 when he found Mr. McDowell capable of returning to his past work. We find some error on the part of the ALJ with respect to each of these arguments. Overall, we determine that the ALJ did not construct a logical bridge from the, admittedly, limited record to his conclusions, and that the ALJ lacked adequate support for several crucial arguments.

### A.    The ALJ's Credibility Determination

First, Mr. McDowell contends that the ALJ's credibility determination was erroneous. Specifically, Mr. McDowell argues that the ALJ erred by improperly: 1) characterizing his smoking; 2) suggesting that he had a history of conservative care; and 3) giving weight to his sparse work record without reasoning. Mr. McDowell also points to the ALJ's use of boilerplate language, but the Seventh Circuit has not remanded cases just for the use of such language.[143]

An ALJ's credibility determination cannot be invalidated unless it is "patently wrong."[144] In determining whether a credibility determination is "patently wrong," the court examines whether the ALJ's determination was reasoned and supported.[145] The Seventh Circuit explained that an ALJ

---

[142] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

[143] *See, e.g.*, *Carter v. Astrue*, 413 F. App'x 899, 905-06 (7th Cir. 2011) (refused to remand simply because of the inclusion of a template credibility finding and held that the ALJ provided an adequate explanation for his credibility finding).

[144] *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2008); *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002).

[145] *See Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

needs only to "minimally articulate his or her justification for rejecting or accepting specific evidence of disability."[146] "It is only when the ALJ's determination lacks any explanation or support that [a court] will declare it to be 'patently wrong.'"[147] Additionally, when determining credibility, an ALJ must consider the entire case record, including the claimant's statements and the opinions of treating or examining physicians and other persons.[148] Under S.S.R. 96-7p, an ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[149] Finally, in determining the claimant's credibility, the ALJ may not ignore the claimant's statements regarding pain and other symptoms or disregard them merely because they are not substantiated by objective medical evidence.[150]

In the present case, the ALJ's credibility determination is not fully reasoned and supported as required by the regulations, and we thus find that the ALJ's overall credibility determination for Mr. McDowell is patently wrong and requires remand.

### 1. Smoking

Mr. McDowell argues that the ALJ improperly relied on his history of smoking in making his credibility determination because he quit in January 2010. Mr. McDowell also argues that the ALJ should have considered the addictive nature of smoking if he was going to take smoking into account for the purpose of credibility.

---

[146] *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) (quoting *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).
[147] *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) (quoting *Jens*, 347 F.3d at 213).
[148] S.S.R. 96–7p.
[149] *Id.*
[150] *Id.*

Mr. McDowell's first argument is that the ALJ significantly factored his smoking habit into the credibility determination despite acknowledging that he quit smoking in January 2010.[151] The Commissioner responds that what the ALJ found relevant was that Mr. McDowell did not quit smoking until January 2010, after smoking up to two packs a day for fifty years.[152] The ALJ stated that "the claimant has continually disregarded his treating physicians' instructions to stop smoking cigarettes, even though his doctors have told him that, if he stopped, his condition would improve."[153]

It was not unreasonable for the ALJ to consider Mr. McDowell's smoking habit in making his credibility determination, especially considering Mr. McDowell's COPD is a direct result of his smoking history. For example, in *Jones v. Astrue*, the court held it was reasonable for the ALJ to consider the claimant's smoking where it likely aggravated her asthma.[154] Similarly, in *Rogers v. Barnhart*, the court upheld the ALJ's credibility finding where the asthmatic claimant was a smoker.[155]

However, we can only assess Mr. McDowell's smoking history from the record available to us. Mr. McDowell correctly points out that there is a note in the record from July 2009 that he was trying to cut back.[156] There is an additional note from August 2009 with the same sentiment, and Dr. Hawkins' assessment from November 2009 stated that Mr. McDowell was down to ten cigarettes a day.[157] While we know Mr. McDowell smoked for fifty years, because the record shows that he was trying to quit and did indeed quit in January 2010, the ALJ's statement that he was

---

[151] R. at 20.
[152] *Id.*
[153] R. at 21.
[154] No. 11 CV 3958, 2012 WL 4120417, at *8 (N.D. Ill. Sep. 18, 2012).
[155] 446 F. Supp. 2d 828, 856 (N.D. Ill. 2006).
[156] R. at 262.
[157] R. at 259.

disregarding his doctors' instructions to quit smoking is not supported by the limited record we have.

The earliest treatment record is from March 2009, just four months prior to the July 2009 note.[158] Based on the minimal medical history, at most it would be fair to say Mr. McDowell was "ignoring" his doctors' instructions to quit smoking for four months. It seems the ALJ inferred that doctors prior to July 2009 had told Mr. McDowell for many years to quit smoking. But if they did, that information is not available to us.

Furthermore, the record does not support the ALJ's statement that doctors told Mr. McDowell his condition would improve if he stopped smoking. The ALJ appears to make this inference from doctors' notes in the record that recommended Mr. McDowell should stop smoking,[159] but no doctor made a specific finding that Mr. McDowell's condition would improve if he quit. In *Rousey v. Heckler*, the court held that the ALJ could not "make his own independent medical determinations about the claimant" when the record was devoid of evidence that the claimant would recover from her impairments if she quit smoking.[160]

Here, while the Commissioner points to some evidence of improvement in Mr. McDowell's condition in the few months after he stopped smoking, it is unclear from the record if this is attributable to smoking cessation, use of an inhaler, or other factors. There was also minimal evidence for the ALJ to review regarding an improvement in Mr. McDowell's condition because he stopped smoking only a few months prior to the hearing.[161] While the Commissioner argues that "[n]o medical source denied that McDowell would improve with smoking cessation," that line of

---

[158] R. at 197.
[159] *See, e.g.*, R. at 259-72, 445.
[160] 771 F.2d 1065, 1069 (7th Cir. 1985).
[161] R. at 421, 426.

reasoning does not appear in the ALJ's decision and our review is limited to the reasons the ALJ articulated.[162]

Mr. McDowell's second argument is that smoking is an addictive habit and an inability to quit does not necessarily suggest that he was "refusing" to quit as the Commissioner offers. Mr. McDowell points to *Shramek v. Apfel* where the court held that given the addictive nature of smoking, a failure to quit is an unreliable basis on which to rest a credibility determination.[163] The court stated that not quitting smoking "is as likely attributable to factors unrelated to the effect of smoking on a person's health."[164] However, the ALJ did not base his entire credibility finding on Mr. McDowell's smoking history, so the absence of discussion about the addictiveness of smoking is not a particular concern of this Court.

Overall, considering the scarcity of the medical records and that Mr. McDowell did quit smoking four months after the earliest record available, the ALJ's credibility findings as they relate to Mr. McDowell's smoking are too conclusory, particularly the ALJ's statement that doctors told Mr. McDowell his condition would improve if he quit.

## 2.    History of Conservative Care

Next, Mr. McDowell argues that the ALJ erred when he found that his "conservative care for physical problems strongly suggested that his symptoms remained well controlled."[165] The Commissioner responds that the ALJ gave several examples of more aggressive treatment Mr. McDowell refused or did not need. These include refusal of an INH treatment, a refusal to have a

---

[162] *See, e.g.*, *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) (noting that the Commissioner's defense of the ALJ's decision on grounds that "the agency itself had not embraced" was improper under the *Chenery* doctrine); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

[163] 226 F.3d 809, 813 (7th Cir. 2000).

[164] *Id.*

[165] R. at 21.

catheterization, and a near-fainting episode in April 2010 that did not require surgery or emergency services.[166] The ALJ also pointed out conservative measures he took that helped control his symptoms.[167]

The regulations allow an ALJ to consider a claimant's treatment regiment in comparison to their claimed limitations,[168] and this Court is "required to give deference to the ALJ's factual determination stemming from that history."[169] On the other hand, a history of conservative care is an "inadequate foundation upon which to base a credibility determination" if such care is appropriate for the claimant's condition.[170] In addition, while refusals of treatment may suggest that Mr. McDowell's symptoms were well controlled, an ALJ should "not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain . . . failure to seek medical treatment."[171] In considering such explanations, the ALJ may need to contact the individual or discuss the reasons with them at the hearing.[172]

The record contains a note from August 2009 that the ALJ did not include in his discussion of Mr. McDowell's history of conservative care: that Mr. McDowell did not want an angiogram because he had no insurance.[173] Though there is no explanation for Mr. McDowell's refusal of the catheterization, it was during the same time period, only one month earlier, in July 2009.[174] Also

---

[166] R. at 20-21.
[167] *Id.*
[168] 20 C.F.R. § 404.1529(c)(3)(v).
[169] *Jones*, No. 11 CV 3958 at *8.
[170] *See, e.g., Agnew v. Astrue*, 2013 WL 24983 *12 (N.D. Ill., Jan 2. 2013).
[171] S.S.R. 96-7p.
[172] *Id.*
[173] R. at 259.
[174] R. at 250.

during the same time period Mr. McDowell refused to have an INH treatment.[175] It would have been ideal for the ALJ to ask Mr. McDowell at the hearing why he refused certain treatments in order to shed some light on his choice of conservative care. In *Alesia v. Astrue*, another judge in this court remanded the case when the ALJ based credibility on conservative care and the claimant had testified that she had no insurance.[176] The *Alesia* court stated, "[t]he ALJ erred by drawing negative inferences from the lack of treatment without first addressing Claimant's ability to pay."[177]

The ALJ similarly erred here by immediately linking Mr. McDowell's conservative care to less severity in his impairments instead of addressing the possible issue of health insurance. On remand, the ALJ should revisit his credibility finding and more fully investigate whether Mr. McDowell's choice of conservative care was affected by an inability to pay.

### 3. Sparse Work Record

Mr. McDowell's third argument is that the ALJ did not offer an explanation for the finding that his previous work record supports a conclusion that his physical limitations were not credible. The Commissioner explained that the ALJ is entitled to take into account a claimant's work history, citing to 20 C.F.R. section 416.929(c)(3) which states that work history can be considered when evaluating a claimant's credibility. It is true that the ALJ may consider the claimant's work history in his credibility determination, but Mr. McDowell reminds us that the ALJ is still required to give "specific reasons for the finding on credibility, supported by the evidence in the case record."[178]

The ALJ cited to Mr. McDowell's work history in the record and found that it "does not suggest a solid motivation or desire to work."[179] The earnings history in the record, found in exhibit

---

[175] R. at 208 (refused treatment in June of 2009).
[176] 789 F. Supp. 2d 921, 934 (N.D. Ill. 2011).
[177] *Id.*
[178] S.S.R. 96-7p.
[179] R. at 21.

3D and 4D, shows that Mr. McDowell did not work consistently.[180] Between 1992 and 1998, Mr. McDowell had no recorded earnings.[181] He worked in 1999 and 2000 but there are no recorded earnings for 2001.[182] He worked in 2002 and 2003, but not in 2004 or 2005.[183] And finally, he worked 2006 through 2008.

Mr. McDowell makes the argument that in the three years prior to the onset of his alleged disability (2006-2008) he was working, and in each of those years he earned more than any year prior to those three.[184] But Mr. McDowell's work record as a whole does show inconsistencies and this Court must defer to the ALJ's findings of fact when they are supported by the record.[185] We would have liked to see the ALJ give further explanation for how Mr. McDowell's work history played into the overall credibility determination, but the ALJ's choice not to do so does not constitute legal error.

While the ALJ's reasoning for relying on Mr. McDowell's poor work history is adequate, we find that the ALJ's discussion of Mr. McDowell's history of both smoking and conservative care is not properly supported and explained by the ALJ in his opinion. On remand the ALJ should work to develop these portions of the record and adjust his credibility determinations appropriately based on any new findings.

## B.    The ALJ's RFC Analysis

Mr. McDowell next argues that the ALJ did not account for all of his impairments in determining that he was capable of light work. If the ALJ did not properly decide Mr. McDowell's

---

[180] R. at 107-11.
[181] Id.
[182] Id.
[183] Id.
[184] R. at 111 (Mr. McDowell earned $9844.65 in 2006, $13,843.90 in 2007, and $9686.10 in 2008 where previously the most money he had made in a year was $7,735.00 in 2002).
[185] 42. U.S.C. § 405(g).

RFC, that could lead to a different outcome in the case. Mr. McDowell briefly makes the point that had the ALJ determined he was limited to sedentary work, most likely he would have been found disabled under the regulations due to his advanced age and limited education.[186]

Mr. McDowell's contention that he cannot perform light work hinges on an apparent discrepancy between Dr Hawkins' report and the SSR's definition of light work. In his opinion, the ALJ noted that "Dr. Hawkins concluded that the claimant . . . had some difficulty in prolonged standing, walking, lifting and carrying due to COPD."[187] The ALJ went on to say that the findings of Dr. Hawkins were consistent with the finding that Mr. McDowell is able to engage in light work.[188] S.S.R. 83-10 defines light work as requiring "a good deal of walking or standing."[189] The definition goes further and states that "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."[190]

The ALJ's conclusion that Dr. Hawkins' assessment is consistent with the definition of light work suggests that when Dr. Hawkins said Mr. McDowell would have some difficulty with "prolonged" standing and walking he must have meant difficulty with more than six hours of standing or walking per day, and no significant amount of difficulty with less than six hours per day. While such a conclusion is not necessarily incorrect, neither the ALJ nor the Commissioner provided support for that reading. The Commissioner points out that there is no evidence in the agency's regulations or rules to the contrary. But on the other hand, there is also no evidence to support the ALJ's understanding of Dr. Hawkins' use of the word "prolonged." This is problematic because how

---

[186] *See* 20 C.F.R. § 404 Subpart P App'x 2 Rule 201.01, 201.02.
[187] R. at 20.
[188] *Id.*
[189] S.S.R. 83-10.
[190] *Id.*

the word "prolonged" is read directly affects whether Dr. Hawkins' conclusions are indeed in line with the definition of light work as the ALJ suggests.

Mr. McDowell's own statements support Dr. Hawkins' finding that he has difficulty with standing and walking, and further suggest that Dr. Hawkins' assessment may not actually be in line with the definition of light work. On numerous occasions Mr. McDowell complained that he was unable to stand or walk for prolonged periods.[191] These include complaints of shortness of breath and weakness while walking two blocks to the store in July 2009, the inability to walk on a treadmill in order to perform an exercise stress test at a hospital in July 2009, only being able to walk two blocks before becoming fatigued in November 2009, only being able to walk two blocks before having to stop in January 2010, and only being able to walk about two and a half blocks in March 2010 after starting on inhalers.[192]

However, the ALJ did not discuss any of these statements made by Mr. McDowell in his opinion. It is possible that this is because he determined that Mr. McDowell was not credible. The Commissioner supports this credibility contention by arguing that outside of Mr. McDowell's inability to perform the stress test at the hospital, all of the information we have about how far Mr. McDowell could walk comes from Mr. McDowell's subjective statements regarding how far he believed he could walk. However, the ALJ did not specifically discredit Mr. McDowell's statements and, in fact, left them out of his opinion altogether, so we have no way to know if he considered them.

Additionally, while it is fair for the Commissioner to point out that these statements were subjective, it is important to note the context in which the statements were made. Mr. McDowell told

---

[191] R. at 239, 243, 280, 421.
[192] *Id.*

treating physicians during his various hospital visits about how far he believed he could walk. None of the treating physicians in the record give any indication in their notes that they had reason to believe Mr. McDowell was exaggerating, and his inability to complete an exercise stress test at the hospital lends itself to Mr. McDowell being credible in these particular complaints. Furthermore, as discussed in the previous section, the ALJ's credibility finding on Mr. McDowell is lacking the full support it requires.

Even if the ALJ had properly discredited Mr. McDowell's statements, if we assume for the sake of argument that Dr. Hawkins was suggesting that less than six hours of standing or walking would give Mr. McDowell difficulty, it is important to determine what weight the ALJ gave to other sources in his RFC assessment. The ALJ purported to give "great weight" to the opinions of non-examining DDS doctors because they "adequately evaluated the medical record and considered the combination of impairments."[193] The ALJ does not explain how he determined that the DDS doctors adequately evaluated the medical record and he gave no explanation for why the DDS doctors should be given great weight outside of that reason.

According to the regulations, examining doctors, such as Dr. Hawkins, are typically entitled to greater weight than non-examining doctors.[194] The only other physician who physically examined Mr. McDowell is Dr. Palacci, and she made no findings regarding Mr. McDowell's ability to stand and walk. Thus, if Dr. Hawkins' opinion is inconsistent with the definition of light work, the ALJ must give further explanation for why he is giving such great weight to the opinions of nonexamining DDS doctors. "Generally, the more consistent an opinion is with the record as a whole," the more weight that is given to that opinion.[195] Dr. Hawkins' statements regarding Mr.

---

[193] R. at 21; *see* R. at 227-33, 296-98.
[194] 20 C.F.R. § 404.1527(c)(1).
[195] 20 C.F.R. § 404.1527(c)(4).

McDowell's difficulty with standing and walking are consistent with Mr. McDowell's subjective statements and at least some medical records, so the nonexamining doctors should be given less weight unless the ALJ has adequate reasoning.

The ALJ did not construct the required logical bridge from the evidence to his conclusion that Mr. McDowell is capable of performing light work.[196] To address the possible inconsistency between Dr. Hawkins' report and the definition of light work, the ALJ should have contacted Dr. Hawkins to get clarification on what she meant when she used the word "prolonged," and if she felt that Mr. McDowell was capable of light work under the definition the regulations provide. Because the outcome of the case is potentially dependent on what Dr. Hawkins meant in her opinion, this issue alone provides enough reason to remand the case.

### C. The ALJ's Finding That Mr. McDowell Could Return to His Past Work

Finally, Mr. McDowell argues that the ALJ's finding that he could return to his previous work as a home health care worker was incorrect because the ALJ did not follow the proper analysis as required by S.S.R. 82-62 in determining whether Mr. McDowell was capable of performing his past relevant work.

S.S.R. 82-62 requires the ALJ to carefully appraise "the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements," medical evidence, and in some cases, further evidence of the requirements of the work as generally performed in the economy.[197] In support of his conclusion that Mr. McDowell could return to his job in home health care, the ALJ stated that "according to the claimant's own testimony, he is generally able to perform the essential functions of his past relevant work."[198] The

---

[196] *Jones*, 623 F.3d at 1160.
[197] S.S.R. 82-62.
[198] R. at 21.

ALJ also said that Mr. McDowell "provided very vague testimony concerning any specific limitations that his COPD and hypertension would cause him while working as a home health care worker."[199]

Mr. McDowell argues that the ALJ mischaracterized his testimony. The ALJ's conclusion that according to Mr. McDowell's own testimony he is able to perform the essential functions of his past relevant work presumably comes from a point in the hearing when Mr. McDowell testified that, other than lifting restrictions, he thought he could still perform the tasks that were involved in his previous job working for Dr. Smith.[200] However, almost immediately after Mr. McDowell said that, when his attorney asked him to clarify if he thought he could presently perform the job, Mr. McDowell said no, he could not, because he got tired too fast and home health care required constant movement.[201] This may suggest Mr. McDowell was confused when he was first asked the question. Mr. McDowell then testified specifically that he would be too tired to go up and down stairs and move around as frequently as he did with Charles, and that he would be too tired to push Dr. Smith's wheelchair to the extent he used to (approximately six blocks in a day).[202] Mr. McDowell also said he quit his last job when he could no longer perform the required duties.[203]

The ALJ's decision does not specifically address the above reasons that Mr. McDowell offered for being unable to return to his past work except to say that they were "vague." S.S.R. 82-62 requires the ALJ to develop and fully explain his decision, but the ALJ did not adequately resolve the conflict between his conclusion and the majority of Mr. McDowell's testimony at the

---

[199] *Id.*
[200] R. at 42.
[201] *Id.*
[202] R. at 42-45.
[203] R. at 41.

hearing.[204] The Commissioner argues that the ALJ's failure to address these findings was inconsequential because the ALJ is not required to address every piece of evidence. However, S.S.R. 82-62 specifically requires an appraisal of the claimant's statements regarding which past work requirements he is no longer capable of performing.[205] While Mr. McDowell's testimony may have appeared vague to the ALJ, S.S.R. 82-62 compels the ALJ to make every effort "to secure evidence that resolves the issue as clearly and explicitly as circumstances permit."[206] The ALJ should have asked Mr. McDowell for clarification if he believed the testimony to be too vague.

The ALJ could have more fully developed his determination that Mr. McDowell could return to his past work as actually performed, or perhaps it would have been beneficial for the ALJ to discuss how home health care work is performed generally in the economy.[207] The ALJ did not make any findings regarding Mr. McDowell's job title or its requirements as generally performed in the economy but he found that Mr. McDowell "is able to perform [the job] as actually and generally performed."[208] There does not appear to be evidence in the record to support such a determination; Mr. McDowell testified that he could not return to his work as it was actually performed, and the ALJ made no determinations about how the job is generally performed.

The Commissioner argues that if this is error, it is a harmless one. However, the error would only be harmless if the Commissioner showed that the ALJ would very likely reach the same decision on remand.[209] But the Commissioner failed to make such a showing. Thus, it is remanded

---

[204] S.S.R. 82-62.

[205] *Id.*

[206] *Id.*

[207] *See* S.S.R. 82-62 (stating that in some cases the ALJ should review "supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy").

[208] R. at 21.

[209] *See Spiva*, 628 F.3d at 352.

for further findings consistent with this opinion.

## V.      Conclusion

For the reasons outlined, the Court grants Mr. McDowell's motion to remand [dkt. 15] and denies the Commissioner's motion to affirm [dkt. 24]. This matter is remanded to the SSA for proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Date: <u>July 2, 2013</u>

Susan E. Cox
U.S. Magistrate Judge